UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT COLEMAN, | No.  2: 17-cv-0851 KJM KJN P |
| Plaintiff, | |
| v. | ORDER AND FINDINGS AND RECOMMENDATIONS |
| T. VIRGA, et al., | |
| Defendants. | |

I.      Introduction

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' summary judgment motion and plaintiff's cross-motion for summary judgment.  (ECF Nos. 80, 84.)  Also pending are several other motions.

For the reasons stated herein, the undersigned recommends that defendants' summary judgment motion be granted and plaintiff's cross-motion for summary judgment be stricken as untimely.

II.     Plaintiff's Cross-Motion for Summary Judgment

Pursuant to the mailbox rule, on June 25, 2020, plaintiff filed an opposition to defendants' summary judgment motion combined with a cross-motion for summary judgment.  (ECF No. 84.)

////

Defendants move to strike plaintiff's cross-motion for summary judgment as untimely. (ECF No. 85.)  The deadline for filing dispositive motions was June 12, 2020.  (ECF No. 76.)  Good cause appearing, plaintiff's cross-motion for summary judgment is stricken as untimely.  However, the arguments and evidence submitted in support of plaintiff's putative cross-motion for summary judgment will be considered as part of plaintiff's opposition to defendants' summary judgment motion.

III.     Other Pending Motions

A.   Defendants' Motion to Strike Plaintiff's Sur-Reply (ECF No. 90)

In the pending motion, defendants move to strike plaintiff's pleading titled "reply in support of plaintiff's cross motion for summary judgment and opposition to defendants' motion for summary judgment," filed July 20, 2020, pursuant to the mailbox rule.  Defendants argue that this pleading is an improper sur-reply.  For the reasons stated herein, defendants' motion to strike is granted.

On June 9, 2020, defendants filed the pending summary judgment motion.  (ECF No. 80.)  On June 25, 2020, plaintiff filed an opposition and cross-motion for summary judgment.  (ECF No. 84.)  On July 7, 2020, defendants filed a reply to plaintiff's opposition and a request to strike plaintiff's cross-motion as untimely.  (ECF No. 85.)  On June 20, 2020, plaintiff filed the at-issue pleading.  (ECF No. 88.)

As discussed above, plaintiff's cross-motion for summary judgment should be denied as untimely.  In the pending motion, defendants move to strike plaintiff's July 20, 2020 pleading as an unauthorized sur-reply to defendants' reply to plaintiff's opposition.

Because plaintiff's summary judgment motion should be stricken as untimely, the undersigned finds that defendants have properly characterized plaintiff's July 20, 2020 pleading as a sur-reply.  The Local Rules provide for a motion, an opposition, and a reply.  Neither the Local Rules nor the Federal Rules provide the right to file a sur-reply.  A district court may allow a sur-reply to be filed, but only "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief."  Hill v. England, 2005 WL 3031136, *1 (E.D. Cal. 2005) (quoting Fedrick v. Mercedes-Benz USA, LLC, 366 F.Supp.2d 1190, 1197

2

1   (N.D. Ga. 2005).

2      The undersigned has considered the arguments raised in plaintiff's points and authorities

3   filed in support of the sur-reply and finds that they do not change the outcome of this action.  For

4   this reason, plaintiff's points and authorities filed in support of the sur-reply are stricken.

5      Plaintiff also attached a declaration to his sur-reply addressing defendants' argument that

6   he released his claims against defendant Haring when he settled a prior action.  (ECF No. 88 at

7   15-16.)  Good cause appearing, the undersigned considers plaintiff's declaration in the section of

8   the findings and recommendations addressing whether plaintiff released his claims against

9   defendant Haring.

10      Accordingly, defendants' motion to strike plaintiff's sur-reply is granted except for

11   plaintiff's attached declaration.

12     B.   Plaintiff's Motion for Sanctions, Motion for Appointment of Counsel and Motion for

13          Appointment of Expert (ECF No. 92)

14      *Motions for Sanctions*

15      In the motion for sanctions, plaintiff argues that defendants failed to comply with the May

16   21, 2020 order addressing plaintiff's motion to compel.  In the May 21, 2020 order, the

17   undersigned directed defendants to file a further response to plaintiff's request for production no.

18   5, which requested the following documents:

19          All Housing Reports for the dates of:  Sept. 22, 2011, Sept. 29, 2011,
           October 3, 2011, Feb. 7, 2013 and Jan. 29, 2011, which should
20          display the total occupied beds by housing units, the number of
           vacant beds in each housing unit and the inmate's ethnicity.  This is
21          for "Facility C."

22   (ECF No. 78 at 16.)

23      In the motion to compel, plaintiff argued that the documents sought in request no. 5 were

24   relevant because they would show the names of the "personnel involved" in bed moves.  (Id. at

25   17.)

26      In response to request no. 5, defendants provided plaintiff with Bed History Reports,

27   redacted, showing plaintiff's information for the referenced dates.  (Id.)  Defendants also argued

28   that the information plaintiff sought, i.e., personnel involved, would not be shown in Bed History

1   Reports.  (Id.)  In the May 21, 2020 order, the undersigned ordered defendant to clarify whether

2   the personnel involved in bed moves would be shown in the Housing Reports requested by

3   plaintiff in request no. 5.  (Id.)  The undersigned also ordered defendants to clarify whether the

4   Housing Reports requested by plaintiff existed.  (Id.)

5            In the pending motion for sanctions, plaintiff argues that after receiving defendants'

6   supplemental responses to request no. 5, he immediately noticed that some "pertinent documents

7   were intentionally suppressed."  (ECF No. 92 at 2.)

8            In particular, plaintiff alleges that defendants claimed that they produced documents with

9   Bates DEF number 001-002, but failed to do so.  (Id. at 2.)  Plaintiff also alleges that defendants

10   failed to provide him with GA-154 forms for February 7, 2013, and January 29, 2016.  (Id. at 2-

11   3.)

12            In the motion for sanctions, plaintiff also alleges that defendants provided plaintiff with

13   Bed Vacancy Reports and Housing Worksheets, which he did not request.  (Id. at 3.)  Plaintiff

14   argues that defendants provided him with these documents because they knew that his request for

15   the Housing Roster would show the total occupied beds by housing unit, the number of vacant

16   beds in each housing unit and the inmate's ethnicity.  (Id. at 3.)

17            In the opposition to plaintiff's motion for sanctions, defendants argue that they previously

18   produced DEF 001-002 to plaintiff with their original responses to his request for production of

19   documents.  (ECF No. 95 at 2.)  Defendants state that plaintiff attached copies of these documents

20   to his motion to compel.  (Id.)  Accordingly, the undersigned finds that defendants did not fail to

21   produce DEF 001-002 to plaintiff.

22            In the opposition, defendants object to plaintiff's argument that they failed to produce

23   GA-154 Forms for February 7, 2013, and January 29, 2016, because GA-154 Forms were not

24   within the scope of the May 21, 2020 order, which only required a supplemental response to

25   request no. 5.  (Id. at 3.)

26            However, in the opposition, defendants state that in response to the May 21, 2020 order,

27   defense counsel contacted the CSP-Sacramento Litigation Coordinator and asked him to search

28   for "all documents containing SAC inmate/bed/housing moves for 9/22/2011, 9/9/2011,

4

10/3/2011, 2/7/2013, and 1/29/2011 and/or reports or documents showing the personnel that requested or were involved in the moves on those dates."  (ECF No. 95-1 at 10-11.)

The CSP-Sacramento Litigation Coordinator located approximately 600 pages of documents (for all facilities), which consisted primarily of GA-154s for the 2011 dates and documents that appeared to be printed from SOMS (Strategic Offender Management System) for the 2013 date.  (Id. at 11.)  The remainder of the documents were bed vacancy reports and count reports.  (Id.)  Defense counsel produced the documents to plaintiff that appeared to be related to Facility C, which is the only Facility plaintiff's request was concerned with.

Contrary to defendants' argument, based on the CSP-Litigation Coordinator's response to defense counsel's inquiry, it appears that GA-154 forms responded to request no. 5.

However, defendants provided plaintiff with a GA-154 form for February 7, 2013, in their supplemental response, although it was listed as having been provided in a supplemental response to request no. 1.  (See ECF No. 95-1 at 5.)  Request no. 5 did not seek documents for January 29, 2016, as alleged by plaintiff in the pending motion.  For these reasons, plaintiff's argument in his motion for sanctions that defendants failed to provide him with GA-154 forms for February 7, 2013, and January 29, 2016, is deemed resolved.

As discussed above, in the motion for sanctions, plaintiff claims that in the supplemental response to request no. 5, defendants provided him with Bed Vacancy Reports and Housing Worksheets, because they knew that these documents would not show the total of occupied beds by housing unit, the number of vacant beds in each housing unit and the inmate's ethnicity. However, in his motion to compel, plaintiff argued that the documents sought in request no. 5 were relevant because they showed the personnel involved in bed moves.  Based on this representation, defense counsel asked the CSP-Sacramento Litigation Coordinator to search for "all documents containing SAC inmate/bed/housing moves for 9/22/2011, 9/9/2011, 10/3/2011, 2/7/2013, and 1/29/2011, and/or reports or documents showing the personnel that requested or were involved in the moves on those dates."

In essence, in the pending motion, plaintiff seeks to expand the scope of documents sought in request no. 5 by arguing that he is seeking documents showing the total number of

5

1   occupied beds by housing unit, the number of vacant beds in each housing unit and the inmate's

2   ethnicity.  This is improper.  The undersigned finds that defendants' adequately responded to

3   request no. 5 in the supplemental response.

4           For the reasons discussed above, plaintiff's motion for sanctions is denied.

5           *Motion for Appointment of Counsel*

6           District courts lack authority to require counsel to represent indigent prisoners in section

7   1983 cases.  Mallard v. United States Dist. Court, 490 U.S. 296, 298 (1989).  In exceptional

8   circumstances, the court may request an attorney to voluntarily represent such a plaintiff.  See 28

9   U.S.C. § 1915(e)(1).  Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991); Wood v.

10  Housewright, 900 F.2d 1332, 1335-36 (9th Cir. 1990).  When determining whether "exceptional

11  circumstances" exist, the court must consider plaintiff's likelihood of success on the merits as

12  well as the ability of the plaintiff to articulate his claims pro se in light of the complexity of the

13  legal issues involved.  Palmer v. Valdez, 560 F.3d 965, 970 (9th Cir. 2009) (district court did not

14  abuse discretion in declining to appoint counsel).  The burden of demonstrating exceptional

15  circumstances is on the plaintiff.  Id.  Circumstances common to most prisoners, such as lack of

16  legal education and limited law library access, do not establish exceptional circumstances that

17  warrant a request for voluntary assistance of counsel.

18          Having considered the factors under Palmer, the undersigned finds that plaintiff has failed

19  to meet his burden of demonstrating exceptional circumstances warranting the appointment of

20  counsel.  Plaintiff's motion for appointment of counsel is denied.

21          *Motion for Appointment of Expert*

22          Plaintiff requests that the court appoint an expert to demonstrate that the actions of

23  defendants led or contributed to plaintiff's mental decompensation.  (ECF No. 92 at 7.)

24          Rule 706 of the Federal Rules of Evidence authorizes the court to appoint an independent

25  expert.  Such an appointment is within the discretion of the trial judge and may be appropriate

26  when "'scientific, technical, or other specialized knowledge will assist the trier of fact to

27  understand the evidence or decide a fact in issue.'"  See Torbert v. Gore, 2016 WL 3460262, at

28  *2 (S.D. Cal. June 23, 2016) (citation omitted); see also Armstrong v. Brown, 768 F.3d 975, 987

(9th Cir. 2014) ("A Rule 706 expert typically acts as an advisor to the court on complex scientific, medical, or technical matters.").

An expert appointed pursuant to Rule 706 does not serve as an advocate for either party, and each party retains the ability to call its own experts. Fed. R. Evid. 706(e); Faletogo v. Moya, 2013 WL 524037, at *2 (S.D. Cal. Feb. 12, 2013) (Rule 706 "does not contemplate court appointment and compensation of an expert witness as an advocate for one of the parties."). "The in forma pauperis statute, 28 U.S.C. § 1915, does not authorize federal courts to appoint or authorize payment for expert witnesses for prisoners or other indigent litigants." Stakey v. Stander, 2011 WL 887563, at *3 n.1 (D. Idaho Mar. 10, 2011); see also Dixon v. Ylst, 990 F.2d 478, 480 (9th Cir. 1993) ("The magistrate judge correctly ruled that 28 U.S.C. § 1915, the in forma pauperis statute, does not waive payment of fees or expenses for witnesses."). "Ordinarily, the plaintiff must bear the costs of his litigation, including expert expenses, even in pro se cases." Stakey, 2011 WL 887563, at *3 n.1.

In this case, plaintiff requests that the court appoint an expert witness to advocate on his behalf, which is not authorized by Rule 706. Even if plaintiff is truly seeking a neutral expert, the undersigned finds that appointment of a neutral expert is not warranted. As discussed herein, the undersigned recommends that defendant Haring be granted summary judgment on the grounds that plaintiff's claims are barred by the statute of limitations and released pursuant to a settlement agreement. The undersigned also finds that defendants Hinrichs, Lynch and Virga should be granted summary judgment as to the merits of plaintiff's Eighth Amendment claims. An expert would not help the court in evaluating plaintiff's Eighth Amendment claims against defendants Hinrichs, Lynch and Virga.

For the reasons discussed above, plaintiff's motion for appointment of an expert witness is denied.

C.   Plaintiff's Supplemental Motion for Sanctions (ECF No. 93)

In his supplemental motion for sanctions, plaintiff again argues that defendants failed to produce all relevant documents in their supplemental response to request for production no. 5, as ordered by the undersigned on May 21, 2020. (ECF No. 93.) Plaintiff argues that he is entitled to

1   receive GA-154 forms dated October 3, 2011, February 7, 2013, and January 29, 2016.  (Id. at 3.)

2           As discussed above, request no. 5 did not seek documents for January 29, 2016.  The

3   records submitted by defendants reflect that they provided plaintiff with GA-154 forms for

4   October 3, 2011, and February 7, 2013.  (ECF No. 95-1 at 5, 6.)

5           On October 5, 2020, plaintiff filed a reply to defendants' opposition.  (ECF No. 97.)  In

6   his opposition, plaintiff appears to raise a new argument that the GA-154 form for October 3,

7   2011, was improperly redacted.  (ECF No. 97 at 2.)  The undersigned will not address this

8   argument because it was not raised in the supplemental motion for sanctions, where plaintiff

9   argued that he did not receive the GA-154 form for October 3, 2011.

10          For the reasons discussed above, plaintiff's supplemental motion for sanctions is denied.

11          D.   Plaintiff's Motion to Amend Evidence (ECF No. 94)

12          In this motion, plaintiff appears to request a copy of an email, which he claims is relevant

13  to his claims against defendant Haring.  (ECF No. 94 at 3.)  Plaintiff also alleges that defendants

14  "deliberately suppressed information that could be viable" to his case by copying over written

15  notes made on a GA-154 document at DEF 185.  (Id.)

16          In the opposition to the pending motion, defendants address plaintiff's claim that they

17  "deliberately suppressed" the GA-154 document at DEF 185.  (ECF No. 96.)  In a declaration

18  attached to the opposition, defense counsel states that after receiving plaintiff's motion, he

19  reviewed the documents he received from CSP-Sacramento in connection with defendants'

20  supplemental response to defendants' request for production.  (ECF No. 96-1 at 1.)  Defense

21  counsel verified that DEF 185 was produced to plaintiff as received from the institution, with the

22  exception of the redaction of information of inmate Thomas.  (Id.)

23          Defense counsel then contacted the Litigation Coordinator at CSP-Sacramento (including

24  providing a copy of the document produced) regarding DEF 185 and inquired whether he had a

25  complete copy of the document and if it was possible it had been scanned incorrectly.  (Id. at 1-2.)

26  The Litigation Coordinator reviewed the document in the archives and verified that the copy he

27  sent to defense counsel was all he was able to recover.  (Id. at 2.)  In his email to defense counsel,

28  the Litigation Coordinator states that, "The copy was actually torn in half.  The bottom portion of

1   the paper is not located within the archives.  I searched through all documents in the folder.  So

2   the copy you have is all we are able to recover."  (Id. at 6.)

3       Based on the information in defendants' opposition, it does not appear that defendants

4   would be able to provide plaintiff with a "better" copy of DEF 185.  For this reason, plaintiff's

5   motion requesting that defendants be sanctioned for providing him with an incomplete copy of

6   DEF 185 is denied.

7       In the pending motion, plaintiff also requests that defendants be ordered to provide him

8   with the email explaining why the request to assign him to a cell with side-by-side beds was not

9   approved by the Captain in October 2011.  (ECF No. 94 at 2-3.)  It appears that plaintiff is

10  seeking additional discovery in order to obtain this email.  Accordingly, the undersigned

11  construes plaintiff's request for this email as having been brought pursuant to Federal Rule of

12  Civil Procedure 56(d).

13      Pursuant to Rule 56(d), a court may give the party opposing summary judgment time to

14  take discovery if the party makes "(a) a timely application which (b) specifically identifies (c)

15  relevant information, (d) where there is some basis for believing that the information sought

16  actually exists."  Emp'rs Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,

17  353 F.3d 1125, 1129 (9th Cir. 2004) (quoting VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.,

18  784 F.2d 1472, 1475 (9th Cir. 1986)).  "The burden is on the party seeking additional discovery to

19  proffer sufficient facts to show that the evidence sought exists, and that it would prevent summary

20  judgment."  Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1161 n.6 (9th Cir. 2001).  "The

21  district court does not abuse its discretion by denying further discovery if the movant has failed

22  diligently to pursue discovery in the past, or if the movant fails to show how the information

23  sought would preclude summary judgment."  Cal. Union Ins. Co. v. Am. Diversified Sav. Bank,

24  914 F.2d 1271, 1278 (9th Cir. 1990).

25      The email plaintiff seeks is related to the merits of plaintiff's claims against defendant

26  Haring.  As discussed herein, the undersigned recommends that defendant Haring be granted

27  summary judgment on the grounds that the claims against him are barred by the statute of

28  limitations and were released pursuant to a settlement agreement.  For this reason, plaintiff has

1  not demonstrated how the additional discovery sought regarding his claims against defendant

2  Haring, i.e., the email, would preclude summary judgment.  Accordingly, plaintiff's motion to

3  conduct additional discovery in order to obtain the email is denied.

4      IV.    Defendants' Summary Judgment Motion

5          A.  Legal Standard for Summary Judgment

6        Summary judgment is appropriate when it is demonstrated that the standard set forth in

7  Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

8  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

9  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> 10              Under summary judgment practice, the moving party always bears
> 11 the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> 12 together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.
> 13

14  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

15  56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need

16  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

17  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

18  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

19  committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

20  burden of production may rely on a showing that a party who does have the trial burden cannot

21  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

22  should be entered, after adequate time for discovery and upon motion, against a party who fails to

23  make a showing sufficient to establish the existence of an element essential to that party's case,

24  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

25  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

26  necessarily renders all other facts immaterial."  Id. at 323.

27        Consequently, if the moving party meets its initial responsibility, the burden then shifts to

28  the opposing party to establish that a genuine issue as to any material fact actually exists.  See

1   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

2   establish the existence of such a factual dispute, the opposing party may not rely upon the

3   allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

4   form of affidavits, and/or admissible discovery material in support of its contention that such a

5   dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7   of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8   (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9   1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

10  a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

11  (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d

12  1564, 1575 (9th Cir. 1990).

13         In the endeavor to establish the existence of a factual dispute, the opposing party need not

14  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

15  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

16  trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

17  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

18  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

19  amendments).

20         In resolving a summary judgment motion, the court examines the pleadings, depositions,

21  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

22  Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

23  255.  All reasonable inferences that may be drawn from the facts placed before the court must be

24  drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587; Walls v. Central Costa

25  County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  Nevertheless, inferences are not

26  drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from

27  which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

28  1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a

1   genuine issue, the opposing party "must do more than simply show that there is some

2   metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

3   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

4   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

5          By notice provided on March 14, 2018 (ECF No. 21), plaintiff was advised of the

6   requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

7   Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

8   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

9              B.  Plaintiff's Claims

10         This action proceeds on plaintiff's amended complaint filed September 5, 2017, as to

11  defendants Haring, Hinrichs, Lynch and Virga.  (ECF No. 13.)

12         *Defendants Hinrichs, Lynch and Virga*

13         Plaintiff alleges that he requires single-cell housing based on mental illness.  (ECF No. 13

14  at 2-3.)  Plaintiff alleges that in 2004, prison psychologist Dias requested that plaintiff receive

15  single-cell status for mental health reasons.  (Id. at 4.)  Prison officials at California State Prison-

16  Centinella denied this request.  (Id.)  Plaintiff alleges that the failure of prison staff to

17  accommodate his need for special housing based on his mental health contributed to the

18  deterioration of his mental health.  (Id. at 5.)  As a result of the deterioration of his mental health,

19  plaintiff was placed in the Crisis Treatment Center ("CTC") of various prisons for suicidal

20  ideation/suicide attempts and was involuntarily medicated for three years.  (Id.)

21         Plaintiff alleges that in 2013, defendants Hinrichs, Lynch and Virga denied his requests

22  for single-cell housing, made in an administrative grievance, on the grounds that plaintiff did not

23  have a history of in-cell physical or sexual violence against a cellmate.  (Id. at 2-3.)  In other

24  words, plaintiff claims, defendants Hinrichs, Lynch and Virga denied plaintiff's request for

25  single-cell housing without regard to plaintiff's mental health needs.  Plaintiff alleges that these

26  defendants failed to consider his mental health needs pursuant to a "practice or custom."  (Id. at

27  3.)  Plaintiff alleges that this was a policy or practice of the California Department of Corrections

28  and Rehabilitation ("CDCR") because in 2016, CDCR Secretary Scott Kernan issued a

1  memorandum clarifying that prison staff were to consider, among other things, inmate mental

2  health, when considering whether to grant single-cell status.  (Id.)

3      Plaintiff alleges that defendants Hinrichs, Lynch and Virga violated his rights "not to be

4  placed in condition of confinement that posed an unreasonable risk of harm to his future and

5  current health…"  (Id. at 18.)

6      *Defendant Haring*

7      Plaintiff alleges that in September 2011, he was housed in a cell containing side-by-side

8  beds pursuant to a policy carried out by defendant Virga requiring certain disabled inmates to be

9  housed only in cells with side-by-side beds.  (Id. at 7.)  Plaintiff alleges that side-by-side beds

10  aggravate his mental illness.  (Id. at 5.)  Plaintiff alleges that he expressed his housing concerns to

11  defendant Haring.  (Id.)  Plaintiff alleges that defendant Haring refused to move him from the cell

12  even after plaintiff warned him that the housing arrangement would be harmful to his mental

13  disorder.  (Id. at 7-8.)

14      C.  Preliminary Matters

15      *Procedural Deficiencies*

16      In the reply, defendants argue that plaintiff failed to respond to their statement of

17  undisputed facts, despite having received notice under Rand.  On these grounds, defendants

18  request that the court find defendants' facts undisputed.

19      Because plaintiff is proceeding pro se, the undersigned considers plaintiff's opposition,

20  despite plaintiff's failure to respond to defendants' statement of undisputed facts.

21      *Defendants' Objections to Plaintiff's Evidence (ECF No. 85-2)*

22      In objection 1, defendants object to the declarations of inmate Ronald Robinson, attached

23  to plaintiff's opposition, on the grounds that the declarant lacks personal knowledge of the facts,

24  his statements are hearsay and they are irrelevant.  (See ECF No. 84 at 44-45.)  In his first

25  declaration, inmate Robinson states that from February 2010-2015, he was aware of the

26  institutional practice to house medically disabled prisoners in side-by-side beds.  (Id. at 44.)  In

27  his second declaration, inmate Robinson states that he knew that inmate Jefferies was openly gay.

28  (Id. at 45.)

The declarations of inmate Robinson are apparently submitted in support of plaintiff's claims against defendant Haring.  As discussed herein, the undersigned finds that plaintiff's claims against defendant Haring are barred by the statute of limitations and released by the settlement of a prior action.  Therefore, because the undersigned does not consider the merits of plaintiff's claims against defendant Haring, the undersigned need not decide the admissibility of inmate Robinson's declarations as to the merits of plaintiff's claims.

As discussed herein, plaintiff argues that his claims against defendant Haring are not barred by the statute of limitations pursuant to the continuing violation doctrine.  Inmate Robinson's declaration regarding inmate Jeffries is not relevant to this argument.  While inmate Robinson's declaration regarding the alleged "institutional practice" to house disabled inmates in side-by-side beds may be relevant to this argument, the undersigned agrees with defendants' objection that inmate Robinson lacks personal knowledge of these facts.  See Fed. R. Evid. 602 ("A witness may testify to support a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.")  Accordingly, inmate Robinson's declarations are excluded from consideration with respect to plaintiff's argument that his claims against defendant Haring are timely pursuant to the continuing violation doctrine.

In objections 2-7, defendants object to statements in plaintiff's declaration submitted in support of his opposition which are related to the merits of his claims against defendant Haring.  In objection 2, defendants object to plaintiff's statements that he told defendant Haring that he would "rather just kill himself" on September 28, 2011.  (ECF No. 84 at 36.)  In objection 3, defendants object to plaintiff's statement that, on September 28, 2011, he was left to stand in a small cramped cage on his injured knee for approximately seven hours.  (Id.)

In objection 4, defendants object to plaintiff's statement that his injured knee required the aid of a nurse and doctor after standing on it for seven hours in the holding cell.  (Id.)  In objection 5, defendants object to plaintiff's statement that defendant Haring was aware of his mental condition.  (Id. at 36-37.)  In objection 6, defendants object to plaintiff's statement that on September 29, 2011, Captain Shannan made plaintiff aware that he was going to building 7, cell 101, to be housed in a side-by-side cell with an openly gay inmate.  (Id. at 37.)  In objection 7,

14

1  defendants object to plaintiff's statement that on September 29, 2011, he refused to be housed

2  with the openly gay inmate because he was sure that defendant Haring had something to do with

3  it.  (Id.)

4      As discussed herein, the undersigned finds that plaintiff's claims against defendant Haring

5  are barred by the statute of limitations and released by the settlement of a prior action.  Therefore,

6  the undersigned need not consider the admissibility of the statements set forth above as to the

7  merits of plaintiff's claims against defendant Haring.  In addition, it does not appear that

8  plaintiff's statements set forth above are relevant to plaintiff's argument that his claims against

9  defendant Haring are timely pursuant to the continuing violation doctrine.  For this reason, the

10  undersigned need not consider the admissibility of these statements as to plaintiff's argument

11  regarding applicability of the continuing violation doctrine.

12      In objection 8, defendants object to plaintiff's statements in his declaration submitted in

13  support of his opposition at paragraphs 28-32.  In paragraph 28, plaintiff states that on September

14  16, 2015, he was housed in a bunk bed.  (Id. at 38-39.)  In paragraph 29, plaintiff states, "On

15  January 29, 2016, I was relocated back to a side by side bed cell."  (Id.)  In paragraph 30, plaintiff

16  states that because he was constantly being compelled to endure the "unlawful practice of being

17  housed in unfavorable cells," he tried to hang himself in 2016.  (Id.)  In paragraph 31, plaintiff

18  states that because of his unsuccessful suicide attempt, his level of care was raised to the

19  Enhanced Outpatient Program.  (Id. at 39.)  In paragraph 32, plaintiff states that on May 28, 2014,

20  he refused to go back to the mainline because of his mental illness and would not return until he

21  received a single cell.  (Id.)

22      Defendants object to the statements in paragraphs 28-32 on the grounds that they are not

23  relevant to the merits of plaintiff's claims against defendants.  The claim against defendant

24  Haring is based on events occurring on September 28, 2011, and the claims against defendants

25  Hinrichs, Virga and Lynch are based on their review of a grievance plaintiff submitted in 2013.

26      The undersigned agrees that the statements in paragraphs 28-32 are not relevant to the

27  merits of plaintiff's claims against defendants.  To the extent plaintiff is attempting to expand his

28  claims against defendants by way of his opposition, such amendment is not proper.  However, to

15

the extent the statements set forth above are relevant (and admissible) to plaintiff's argument that his claims against defendant Haring are not barred by the statute of limitations pursuant to the continuing violation doctrine, defendants' objections are overruled.

In objection 9, defendants object to plaintiff's statement in his declaration that defendants denied his request for exclusion from side-by-side beds or single cell because of a policy, custom, or practice by the departments' officials who are denying inmate requests for special housing because their records do not contain a history of in-cell abuse. (Id.) In support of this statement, plaintiff cites his deposition. (Id.) Defendants object to this statement on the grounds that it lacks personal knowledge of the facts stated, lacks foundation, is hearsay and contradicts plaintiff's deposition testimony.

As discussed above, in the amended complaint plaintiff alleges that defendants Hinrichs, Lynch and Virga denied his request for single-cell status pursuant to a policy that failed to consider inmate mental health when determining housing status. In his opposition, plaintiff cites other evidence that allegedly demonstrates the existence of this policy. Accordingly, the undersigned herein considers this statement in plaintiff's declaration only to the extent it is supported by additional evidence in plaintiff's opposition.

In objection 10, defendants object to plaintiff's statement in his declaration that while plaintiff was incarcerated at California State Prison-Lancaster ("LAC"), he attempted to receive single-cell status, but this request was denied because plaintiff's prison record did not contain a history of in-cell abuse. (Id.) In support of this claim, plaintiff cites exhibit J attached to the amended complaint filed September 1, 2017. (ECF No. 12 at 52.) Exhibit J is a classification committee chrono from LAC dated April 4, 2017. (Id.) This chrono states that plaintiff was found to meet the double-cell criteria for various reasons unrelated to his mental health. (Id.)

Defendants object to plaintiff's statement in his declaration that he was denied single-cell status at LAC on the grounds that it is not relevant because plaintiff's claims against defendants occurred at CSP-Sacramento in 2013.

While plaintiff alleges that defendants denied him single-cell status in 2013 pursuant to a policy that excluded inmate mental health from consideration of housing status, the undersigned

16

1   finds that the LAC classification committee chrono from 2017 is not relevant to this claim.

2   Accordingly, plaintiff's statement regarding events occurring at LAC is excluded from

3   consideration.

4       D.   Are Plaintiff's Claims Against Defendant Haring Barred by the Statute of

5       Limitations?

6      *Legal Standard*

7       For claims brought under 42 U.S.C. § 1983, the applicable statute of limitations is

8   California's statute of limitations for personal injury actions.  See Wallace v. Kato, 549 U.S. 384,

9   387-88 (2007).  In California, there is a two-year statute of limitations in § 1983 cases.  See Cal.

10  Civ. Proc. Code § 335.1; Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004); Jones v.

11  Blanas, 393 F.3d 918, 927 (9th Cir. 2004) ("[f]or actions under 42 U.S.C. § 1983, courts apply

12  the forum state's statute of limitations for personal injury actions.").

13      State tolling statutes also apply to § 1983 actions.  See Elliott v. City of Union City, 25

14  F.3d 800, 802 (1994) (citing Hardin v. Straub, 490 U.S. 536, 543-44 (1998)).  California Civil

15  Procedure Code § 352.1(a) provides tolling of the statute of limitations for two years when the

16  plaintiff, "at the time the cause of action accrued, [is] imprisoned on a criminal charge, or in

17  execution under sentence of a criminal court for a term of less than for life."  Accordingly,

18  prisoners generally have four years from the time the claim accrues to file their action.

19      The statute of limitations is tolled for the time it takes for a prisoner to administratively

20  exhaust his underlying grievances.  See Brown v. Valoff, 422 F.3d 926, 942-43 (9th Cir. 2005)

21  ("the applicable statute of limitations must be tolled while a prisoner completes the mandatory

22  exhaustion process"

23      Notwithstanding the application of the forum's state law regarding the statute of

24  limitations, including statutory and equitable tolling, in the context of a § 1983 action, it is

25  "federal law" which "governs when a claim accrues."  Fink v. Shedler, 192 F.3d 911, 914 (9th

26  Cir. 1999) (citing Elliott v. City of Union City, 25 F.3d 800, 801-02 (9th Cir.1994)).  "A claim

27  accrues when the plaintiff knows, or should know, of the injury which is the basis of the cause of

28  action."  Id. (citing Kimes v. Stone, 84 F.3d 1121, 1128 (9th Cir.1996)).

*Discussion*

Defendants argue that plaintiff's claims against defendant Haring accrued in September 2011 when defendant Haring allegedly refused to move plaintiff from the cell containing side-by-side beds.  Defendants state that plaintiff's claim specifically accrued on September 28, 2011, which is the date defendant Haring issued plaintiff a rules violation report for refusing to return to his cell.  Defendants argue that plaintiff had four years from September 28, 2011, i.e., until September 28, 2015, to file a timely action.  Defendants argue that the instant action, filed on April 19, 2017, pursuant to the mailbox rule, was filed a year and a half too late.

In his opposition, plaintiff does not appear to dispute that his claims against defendant Haring arose on September 28, 2011.

Defendants argue that even including the time it took plaintiff to exhaust his available administrative remedies, plaintiff's claim against defendant Haring is time barred.  Defendants state that plaintiff submitted his first level administrative grievance on August 6, 2013, and the process was complete on January 28, 2014, i.e., a period of 176 days, including the last day.  (See ECF No. 80-4 at 66 (Third Level Decision for grievance no. SAC-13-02151 dated January 28, 2014); id. at 68-74 (602 grievance signed by plaintiff on August 6, 2013 for grievance SAC-13-02151)).  Adding 176 days to September 28, 2015, extends the statute of limitations to March 22, 2016.  The instant action, filed April 19, 2017, is still not timely.[1]

In his opposition, plaintiff argues that his claims against defendant Haring are not barred by the statute of limitations based on the continuing violation doctrine.  (ECF No. 84 at 19-21.)

"The continuing violation doctrine is an equitable doctrine designed 'to prevent a defendant from using its earlier illegal conduct to avoid liability for later illegal conduct of the same sort." Herrington v. Bristol, 2019 WL 7598855, at *14 (D. Ore. July 29, 2019) (citing O'Loghlin v. Cty of Orange, 229 F.3d 871, 875 (9th Cir. 2000)).  "A continuing violation, or

---

[1] The undersigned observes that grievance SAC-13-02151 raised plaintiff's claim that defendant Haring housed plaintiff in a cell with a side-by-side bed.  (Id. at 70.)  In his response to defendants' interrogatories, plaintiff also states that grievance no. SAC-13-02151 exhausted his administrative remedies as to his claims against defendant Haring.  (ECF No. 80-4 at 119.)  Therefore, the parties do not dispute that grievance no. SAC-13-02151 exhausted plaintiff's claims against defendant Haring.

18

continuing tort, occurs when a series of wrongful acts of the same nature causes the alleged harm, rather than a specific act within the larger pattern of wrongful conduct." Id. (citing Flowers v. Carville, 310 F.3d 1118, 1126 (9th Cir. 2002) (citing Page v. United States, 729 F.2d 818, 821 (D.C. Cir. 1984)). "The doctrine thus comes into play only where there is no discrete act or incident that can fairly be determined to have caused the alleged harm." Id. (citing Flowers, 310 F.3d at 1126). "If the continuing violation doctrine applies, the cause of action accrues when the tortious conduct ceases." Id. (citing Flowers, 310 F.3d at 1126).

"The continuing violation doctrine applies to Section 1983 actions." Id. at * 15 (citing Knox, 260 F.3d at 1013). "The Ninth Circuit has yet to apply the doctrine to Eighth Amendment deliberate indifference claims, but it has recently suggested a willingness to do so." Id. (citing Chestra v. Davis, 747 F. App'x 626, 627 (9th Cir. 2019) ("And, even assuming that the continuing-violation doctrine applies [to this Eighth Amendment deliberate indifference claim], Chestra does not allege sufficient facts within the statute of limitations to satisfy this doctrine"). "Furthermore, other circuits have applied the doctrine to such claims, as have many district courts in this circuit." Id. (citing Heard v. Sheahan, 253 F.3d316, 318 (7th Cir. 2001) (defendants' alleged continuous refusal to treat a prisoner's hernia was a "series of wrongful acts" which created a "series of claims"); Lavellee v. Listi, 611 F.2d 1129, 1132 (5th Cir. 1980) ("[F]ailure to provide needed and requested medical attention constitutes a continuing tort, which does not accrue until the date medical attention is provided"); Sheridan v. Reinke, 2012 WL1067079, at *5 (D. Idaho Mar. 28, 2012) (allegations of continuing deliberate indifference to prisoner's personal safety were sufficiently related to survive motion to dismiss); Guitterrez v. Williams, 2011 WL 2559788, at *5 (D. Or. June 29, 2011) (pro se plaintiff's allegations that suggested a number of Eighth Amendment violations occurred during the two-year limitations period was sufficient to defeat motion to dismiss based on timeliness).

"The continuing violation doctrine therefore may toll the two-year statute of limitations if [plaintiff] can provide evidence the alleged acts 'are related closely enough to constitute a continuing violation, and that one or more of the acts falls within the limitations period.'" Id. quoting Knox, 260 F.3d at 1013 (quoting DeGrassi v. City of Glendora, 207 F.3d 636, 645 (9th

1    Cir. 2000)).  "In considering whether the doctrine applies, '[e]ach defendant's conduct is

2    separately evaluated to determine if that defendant engaged in a continuing pattern of

3    violations.'"  Id. (quoting Alexander v. Williams, 2013 WL 6180598, at *15 (D. Or. Nov. 25,

4    2013) (quoting Davis v. N.J. Dep't of Corr., 2011 WL 5526081, at *6 (D.N.J. Nov. 14, 2011)).

5    "However, the continuing violation doctrine does not apply if the harm alleged is a 'mere

6    continuing impact from past violations,'" Id. (quoting Knox, 260 F.3d at 1013), "or if the claim is

7    'based on an independently wrongful, discrete act.'"  Id. (quoting Pouncil v. Tilton, 704 F.3d 568,

8    581 (9th Cir. 2012)).  "Thus, 'the critical distinction in the continuing violation analysis is

9    whether the plaintiff complains of the present consequence of a one-time violation, which does

10    not extend the limitations period, or the continuation of that violation into the present, which

11    does.'"  Id. (quoting Brown v. Ga. Bd. Of Pardons & Paroles, 335 F.3d 1259, 1261 (11th Cir.

12    2003) (citation omitted)).

13         In support of his argument that the continuing violation doctrine applies to his claims

14    against defendant Haring, plaintiff allege that he was placed in a side-by-side bed from October 3,

15    2011, until January 28, 2013, and from February 7, 2013, to June 28, 2013.  (ECF No. 84 at 38.)

16         However, assuming applicability of the continuing violation doctrine to plaintiff's Eighth

17    Amendment deliberate indifference claim, plaintiff does not allege a series of ongoing, related

18    acts by defendant Haring, of which at least one falls within the period of limitations.  Rather,

19    plaintiff alleges that defendant Haring violated his constitutional rights during one discrete

20    incident, i.e., on September 28, 2011, when defendant Haring allegedly refused to move plaintiff

21    from the cell containing a side-by-side bed.  Plaintiff does not allege (or demonstrate) that

22    defendant Haring continued to be responsible for plaintiff's placement in cells with side-by-side

23    beds after September 28, 2011.  For these reasons, plaintiff has not demonstrated applicability of

24    the continuing violation doctrine.

25         In addition, the undersigned observes that in his operative amended complaint, plaintiff

26    alleges that in September 2011, based on a "very discriminatory 'custom' arbitrarily being carry

27    out and condoned by Defendant T. Virga, SAC's Warden, prison officials who mandating certain

28    disabled inmates to [only] be housed in a side-by-side bed cell.  Plaintiff was relocated to a

building, that contains such cells."  (ECF No. 13 at 7.)  Plaintiff goes on to allege, in relevant part,

"Here, prison officials claim that a 'side-by-side' bed cells are reserved for inmates whose

disabilities mandate their placement on the lower tier bunk.  But after plaintiff had his 'lower tier'

restriction chrono removed on December 19, 2011, voluntarily, so he would no longer meet the

prison criteria...However, SAC's officials still mandated his placement inside such cells."  (Id. at

9.)

In the amended complaint, plaintiff alleges that despite the removal of his lower tier

restriction in December 2011, prison officials not named as defendants in this action continued to

place him in cells with side-by-side beds.  Therefore, plaintiff does not allege that continued

application of the policy identified in the amended complaint led to his placement in cells with

side-by-side beds after December 2011.  These alleged circumstances further undermine

plaintiff's argument that his claims against defendant Haring are subject to the continuing

violation doctrine.

For the reasons discussed above, the undersigned finds that plaintiff's claims against

defendant Haring are barred by the statute of limitations.  On these grounds, defendant Haring

should be granted summary judgment.

E. Did Plaintiff Release His Claims Against All Defendants When He Settled His
   Prior Action In 2017?

Defendants argue that plaintiff released all claims raised in the instant action in the

settlement agreement reached in Coleman v. CDCR, 2:13-cv-1021 JAM KJN P (E.D.).

A release terminates legal liability between the releasor and the releasee.  McKee v.

McKenna, 2012 WL 4127732, at *4 (Aug. 10, 2012).  The interpretation and validity of a release

of federal claims is governed by federal law.  Id.; see Jones v. Taber, 648 F.2d 1201, 1203 (9th

Cir. 1981); Stroman v. West Coast Grocery Co., 884 F.2d 458, 461 (9th Cir. 1989).  "Moreover,

'an agreement need not specifically recite the particular claims waived in order to be effective.'"

Id. (quoting Stroman, 884 F.2d at 461).

A release of claims for violations of civil and constitutional rights must be voluntary,

deliberate, and informed.  Id. (citing Jones, 648 F.2d at 1203).  "A party seeking to rely on a

1  release in a § 1983 action has the burden of proving its validity." Id. (citing Jones, 648 F.3d at

2  1203–04).

3      Case no. 13-1021 proceeded on plaintiff's second amended complaint against two

4  defendants named in the instant action, i.e., defendants Haring and Virga, as well as defendants

5  DeRoco and Clough.  See 13-cv-1021 JAM KJN P (ECF No. 67 at 1).  Plaintiff alleged that he

6  was discriminated against in violation of § 504 of the Rehabilitation Act ("RA"), based on his

7  mental and physical disability, when defendant Haring denied plaintiff bunk-bed housing, and

8  insisted on housing plaintiff in side-by-side beds cells.  Id. (ECF No. 67 at 1-2.)  Plaintiff also

9  alleged that defendant Haring violated his Eighth Amendment rights by his efforts to place

10  plaintiff in the side-by-side cell on September 28, 2011.  Id. (ECF No. 67 at 2, 8-9.)

11      In 13-1021, plaintiff also alleged that defendants Virga, DeRoco and Clough violated

12  plaintiff's right not to be discriminated against by regarding plaintiff as affiliated or associated

13  with a "disruptive group" which took part in racial riots on December 7, 2011, and April 16,

14  2012, even though plaintiff did not participate in the riots.  Id. (ECF No. 67 at 2-3.)  Plaintiff

15  challenged the extended modified program on equal protection grounds.  Id. (ECF No. 67 at 2-3.)

16  In 13-1021, plaintiff also alleged that defendants Virga, DeRoco and Clough were deliberately

17  indifferent to plaintiff's serious need for outdoor exercise from December 7, 2011, until February

18  6, 2012.  Id. (ECF No. 67 at 3.)

19      On December 9, 2015, plaintiff's claims against defendant Haring in 13-1021 were

20  dismissed based on plaintiff's failure to exhaust administrative remedies.  Id. (ECF No. 77.)

21      On March 6, 2017, the parties voluntarily dismissed 13-1021 pursuant to a settlement

22  agreement.  Id. (ECF Nos. 130, 131.)  The settlement agreement states, in relevant part, that it

23  concerns plaintiff "and the California Department of Corrections and Rehabilitation ("CDCR") on

24  behalf of defendants Virga, deRoco, Haring and Clough."  (ECF No. 80-4 at 101.)  The settlement

25  agreement states, in relevant part, that the agreement "covers all of the claims and allegations in

26  the complaint and any amendments thereto against defendants, whether named or unnamed and

27  whether served or unserved, and any past or current employees of CDCR."  (Id.)

28  ////

The settlement agreement states, in relevant part, that

> It is the intention of the parties in signing this agreement that it shall be effective as a full and final accord and satisfaction and release from all claims asserted in the complaint. By signing this agreement, plaintiff releases CDCR, defendants, whether named or unnamed and whether served or unserved, and any other past or current CDCR employees from all claims, past, present and future, known or unknown, that could arise from the facts alleged in the complaint.

(Id. at 102.)

In the pending summary judgment motion, defendants argue that plaintiff released the claims raised in the instant action because they arise from the facts alleged in 13-1021. Defendants contend that there can be no dispute that the release signed in 13-1021 by plaintiff was voluntary, deliberate and informed. In support of the argument that plaintiff understood the terms of the settlement agreement, defendants cite plaintiff's deposition testimony, where plaintiff acknowledged his signature on the settlement agreement. (ECF No. 80-4 at 61.) Defendants contend that plaintiff signed the agreement and release after it was negotiated in a neutral environment; plaintiff signed the release after a settlement conference conducted by a United States magistrate judge (the undersigned), at which he indicated his understanding of the terms; and plaintiff received $15,000 in exchange.

For the following reasons, the undersigned finds that plaintiff did not release his claims against defendants Hinrichs, Lynch and Virga in the settlement agreement reached in 13-1021. In the instant action, plaintiff alleges that defendants Hinrichs, Lynch and Virga denied his request for single-cell housing in 2013 without regard to plaintiff's mental health needs. Plaintiff alleges that these defendants failed to consider his mental health needs pursuant to a "practice or custom," which did not consider inmate mental health when determining whether inmates qualified for single-cell housing. Plaintiff did not raise these claims against defendants Hinrichs, Lynch and Virga in 13-1021. In addition, the claims raised against defendant Hinrichs, Lynch and Virga in the instant action do not arise from the claim that defendant Haring subjected plaintiff to side-by-side housing in 2011, raised in 13-1021.[2] The claims raised against

---

[2]  The court previously denied defendants' motion to dismiss the claims against defendants Hinrichs, Lynch and Virga on the grounds of claim preclusion, i.e., plaintiff could have raised

1    defendants Hinrichs, Lynch and Virga in the instant action also do not arise from the claim that

2    defendants Virga, DeRoco and Clough denied plaintiff's need for outdoor exercise from

3    December 7, 2011, until February 6, 2012, raised in 13-1021.  Accordingly, defendants' motion

4    for summary judgment on the grounds that plaintiff released his claims against defendants

5    Hinrichs, Lynch and Virga should be denied.

6         It is clear that plaintiff raised the claim he now raises against defendant Haring in 13-

7    1021.  In his opposition, plaintiff argues that "no evidence exists that he knew or was aware that

8    the settlement agreement included his claims against defendant Haring."  (ECF No. 84 at 26.)

9         In support of this argument, plaintiff cites <u>Jones v. Taber</u>, 648 F.2d 1201 (9th Cir. 1981),

10   where the Ninth Circuit found that, "[i]n the context of section 1983 waivers, several factor are

11   relevant:  although both parties may agree on certain facts, including the accuracy of the

12   transcript of the claimed settlement conference, summary judgment is precluded when conflicting

13   inferences might be drawn about a party's state of mind as reflected by objective indications."  <u>Id.</u>

14   at 1204.  In <u>Jones</u>, the court concluded that even the fact that Jones admitted that his signature on

15   the release was voluntary was not controlling.  <u>Id.</u>  "That Jones admitted in his deposition that his

16   signature on the release was 'voluntary' is not by itself controlling in this regard, absent a

17   showing that he understood the meaning of the term in its legal sense."  <u>Id.</u>  "On the record before

18   us his statement amounts to little more than a legal conclusion on a question as to which he was

19   not well informed."  <u>Id.</u>  In <u>Jones</u>, the Ninth Circuit also found that "objective indications of

20   coercive pressures and a lack of understanding [footnote omitted] here that preclude granting

21   summary judgment for defendants."  <u>Id.</u>

22        In his verified declaration submitted in support of his opposition, plaintiff does not claim

23   that he did not understand that his settlement in 13-1021 included his claims against defendant

24   Haring.  (<u>Id.</u> at 35-40.)  However, in the declaration filed in support of his sur-reply, plaintiff

25   states that at the March 2, 2017 settlement hearing in 13-1021, he "was never made aware or

26   given the impression that my agreement would include the dismissal without prejudice defendant

27

28   these claims in 13-1021.  (<u>See</u> ECF Nos. 53, 56.)

Haring.  Because the hearing only spoke on my claims against defendants Virga, Deroco and Clough, i.e., my 'modified program' claims.  And the settlement transcripts will bolster my claim."  (ECF No. 88 at 15-16.)

As discussed above, the written settlement agreement in 13-1021 identifies defendant Haring as one of the parties to the settlement.  (ECF No. 80-4.)  The written settlement agreement specifically states that the agreement releases defendants (including defendant Haring) from all claims, past, present and future, known or unknown, that arise or could arise from the facts alleged in the complaint.  (Id. at 102.)  Thus, the written settlement agreement released plaintiff's claims against defendant Haring, even though the claims against defendant Haring had been dismissed based on plaintiff's failure to exhaust administrative remedies.

The undersigned has listened to the recording of the March 2, 2017 hearing where the settlement agreement in 13-1021 was placed on the record.  Although plaintiff's claims against defendant Haring were not specifically discussed at this hearing, the undersigned discussed with plaintiff the terms of the settlement agreement, as set forth above, including the release.  At the hearing, the undersigned stated that plaintiff would receive $15,000 for the resolution of "all claims" that plaintiff brought or could have brought in 13-1021.  The undersigned did not state that the settlement was limited to plaintiff's claims against defendants Virga, Deroco and Clough regarding the modified program, as plaintiff alleges in his declaration attached to his sur-reply.  Plaintiff expressed no confusion or concerns regarding the terms of the settlement agreement.

In Jones, supra, the record contained evidence suggesting that the plaintiff's agreement to the release was not voluntary.  For this reason, the Ninth Circuit found that the plaintiff's signature on the release was not sufficient evidence that his agreement to the release was voluntary.  In contrast, in the instant case, the record contains no evidence demonstrating that at the time plaintiff entered the settlement agreement, plaintiff was coerced or that he did not understand that the release included all of the claims he brought or could have brought against defendants, including his claims against defendant Haring.  As discussed above, the terms of the settlement agreement, signed by plaintiff, identified defendant Haring as a party to the agreement and released plaintiff's claims against all defendants.

1    Accordingly, for the reasons discussed above, the undersigned finds that the evidence

2  demonstrates that plaintiff waived his claims against defendant Haring in the settlement

3  agreement reached in 13-1021.  On these grounds, defendant Haring should be granted summary

4  judgment.

5        F.   Did Defendants Hinrichs, Lynch and Virga Violate Plaintiff's Eighth Amendment

6             Rights in 2013 When They Denied Plaintiff's Requests for Single-Cell Status?

7    *Legal Standard*

8    Where a prisoner's Eighth Amendment claim arises in the context of medical care,

9  including mental health care, the prisoner must allege and prove "acts or omissions sufficiently

10  harmful to evidence deliberate indifference to serious medical needs."  Estelle v. Gamble, 429

11  U.S. 97, 106 (1976).  An Eighth Amendment medical claim has two elements: "the seriousness of

12  the prisoner's medical need and the nature of the defendant's response to that need."  McGuckin

13  v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc.

14  v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

15    A medical need is serious "if the failure to treat the prisoner's condition could result in

16  further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin, 974

17  F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical need include

18  "the presence of a medical condition that significantly affects an individual's daily activities."  Id.

19  at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the

20  objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S.

21  825, 834 (1994).

22    If a prisoner establishes the existence of a serious medical need, he must then show that

23  prisoner officials responded to the serious medical need with deliberate indifference.  See Farmer,

24  511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny,

25  delay, or intentionally interfere with medical treatment, or may be shown by the way in which

26  prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th

27  Cir. 1988).

28  ////

1    Before it can be said that a prisoner's civil rights have been abridged with regard to

2    medical care, "the indifference to his medical needs must be substantial.  Mere 'indifference,'

3    'negligence,' or 'medical malpractice' will not support this cause of action."  Broughton v. Cutter

4    Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06); see also

5    Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in

6    diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth

7    Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of

8    mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for

9    the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835.

10    Finally, mere differences of opinion between a prisoner and prison medical staff or

11    between medical professionals as to the proper course of treatment for a medical condition do not

12    give rise to a § 1983 claim.  See Toguchi, 391 F.3d at 1058.

13    *Defendants' Motion*

14    Defendants contend that plaintiff's claims against them are based on their denial of

15    plaintiff's administrative grievances requesting single-cell housing, as alleged in the September 5,

16    2017 amended complaint.  At his deposition, plaintiff testified that his claims against defendants

17    Virga, Hinrichs and Lynch were based on their denial of his grievances requesting single-cell

18    status filed in 2013.  (Plaintiff's deposition at 19, 53-56.)

19    Defendants move for summary judgment on the grounds that at the time they denied

20    plaintiff's grievances requesting single-cell status, nothing in plaintiff's records indicated that a

21    mental health clinician had recommended him for single-cell status.  Therefore, defendants argue,

22    they did not act with deliberate indifference when they denied plaintiff's grievances.  The

23    undersigned sets forth defendants' evidence in support of these arguments herein.

24    In his declaration, defendant Virga states that per CDCR regulations and the Department's

25    Operational Manual ("DOM"), classification committees, not individual staff, determine whether

26    an inmate should be single-celled or double-celled.  (ECF No. 80-7 at 2.)  Under CDCR

27    regulations, the expectation is that all inmates are expected to double-cell and to accept housing

28    as assigned; this applies whether the inmates is housed in general population, administrative

segregation or a security housing unit.  (Id.)  Per CDCR regulations, inmates are not entitled to single-cell assignment, housing location of choice or to a cellmate of their choice.  (Id.)

Defendant Virga states in his declaration that under the regulations, classification committees may consider inmates for single-celling based on factors enumerated in the DOM and regulations and will consider any recommendations of medical or mental health staff for single-cell status.  (Id.)

In grievance no. SAC-13-02151, plaintiff appealed the July 3, 2013 decision of the Institutional Classification Committee ("ICC") for the Administrative Segregation Unit ("ASU") finding him eligible for double-cells status.  (Id. at 5-7.)  In this grievance, plaintiff claimed that clinicians had requested that he be given single-cell status.  (Id. at 5-7.)  Defendant Virga served as the chairperson of the July 3, 2013 Classification Committee which found that plaintiff qualified for double-cell status.  (Id. at 12.)

The July 3, 2013 Classification Committee report states, in relevant part, "Double Cell with compatible housing status based on no documented history of in-cell violence, no predatory behavior, and no victimization concerns.  ICC has reviewed and discussed the outside the cell violence; RVR 12/05/01 Mutual Combat."  (Id.)  The Classification Committee report also contains a mental health assessment which states:  "The treating clinician presented ICC with a Mental Health Assessment that included S's Level of Care, treatment needs, ability to understand/participate in the classification committee hearing, and effects of this psychological state will not decompensate if ordered retained in segregated housing."  (Id.)

In his declaration, defendant Virga states that mental health clinician C. Moazam was present at the committee.  (Id. at 2.)  Defendant Virga states that if a single cell had been recommended due to plaintiff's mental health status, any such recommendation would have been considered by the committee and would have been reflected on the 128-G.  (Id.)  Defendant Virga states that the fact that no recommendation is noted on the 128-G indicates that no such recommendation was made.  (Id.)  Defendant Virga also states that plaintiff refused to appear at the committee.  (Id.)  Defendant Virga states that because plaintiff did not attend the committee, the committee did not have plaintiff's input as to double or single-celling and his mental health

condition.  (Id.)

On September 19, 2013, defendant Hinrichs denied plaintiff's first level grievance, no. SAC-13-02151, in which plaintiff claimed clinicians gave him single-cell status and excluded plaintiff from side-by-side beds.  (ECF No. 80-6 at 9.)  Plaintiff stated that he should be single-celled "based on a medical standpoint."  (Id.)

In denying plaintiff's grievance, defendant Hinrichs wrote,

> During all your General Population time, you have been double celled by all committees.  You have also been doubled celled while in ASU.  The Mental Health documents you have provided do not place you on single cell status or exclude you from cells with side by side beds.  The one document (CDCR 7230 MH) only states a discussion you had with a clinician wherein you requested single cell and exclusion from the cells with side by side beds.  This was dated October 1, 2011.  Clinicians cannot make you single celled or exclude you from certain housing.  The clinician did refer you on January 23, 2004 to Inter Disciplinary Treatment Team (IDTT) for evaluation of Single Cell Status.  You have been evaluated at each Committee and it has been determined based on no documented history of in-cell violence, no predatory behavior and no victimization concerns, you can be double celled.
>
> Mental Health staff were contacted to review your health records regarding single cell.  Mental health staff reported, "On his most recent treatment plan, 'no recommendation' for housing is marked.  There is no mention of single cell in the recent notes or treatment plan."
>
> It is the expectation of the department for all inmates to double cell.

(Id. 80-6 at 9.)

In his declaration submitted in support of the summary judgment motion, defendant Hinrichs states that in reviewing plaintiff's grievance, he reviewed the classification committee's actions, relevant departmental regulations, and any documents attached to plaintiff's appeal, plaintiff's housing history and past classification committee actions.  (Id. at 2.)  Defendant Hinrichs states that custody staff do not have access to mental health or medical records, thus defendant Hinrichs could not review those records.  (Id.)  Defendant Hinrichs states that in addition, due to medical privacy laws, medical and mental health staff could only provide limited information to custody staff, which would usually be reflected in a mental and/or mental health chrono in the inmate's central file.  (Id.)  If a medical or mental health clinician believed a single

1   cell was required by an inmate's medical or mental health condition, that would be reflected on a

2   chrono in the central file.  (Id.)

3        Defendant Hinrichs states that as reflected in his first level response to plaintiff's

4   grievance, defendant Hinrichs's review of plaintiff's records reflected that all committees had

5   double-celled plaintiff throughout his incarceration with CDCR.  (Id.)  No mental health clinician

6   had placed plaintiff on single-cell status and the October 1, 2011 document plaintiff provided did

7   not indicate that the clinician wanted him single-celled.  (Id.)  In addition, as part of defendant

8   Hinrichs's review of plaintiff's appeal, defendant Hinrichs contacted mental health staff to review

9   plaintiff's health records regarding single-cell status.  (Id. 2-3.)  Mental health staff reported to

10   defendant Hinrichs that on plaintiff's most recent treatment plan, no recommendation for housing

11   was marked and there was no mention of single-cell in recent notes or treatment.  (Id. at 3.)

12   Therefore, no mental health clinician had recommended that plaintiff be single celled or excluded

13   from side-by-side cells when defendant Hinrichs reviewed plaintiff's grievance in September

14   2013.  (Id.)

15        On November 6, 2013, defendant Virga denied grievance no. SAC-S-13-02151 at the

16   second level of review.  (ECF No. 80-8 at 8.)  Defendant Lynch was designated by defendant

17   Virga to conduct an inquiry into plaintiff's grievance.  (Id.)  In his declaration submitted in

18   support of the summary judgment motion, defendant Lynch states that when he was assigned

19   plaintiff's appeal for review, he determined that the First Level of Review had conducted an

20   appropriate review and that the decision to classify plaintiff as double-celled was appropriate

21   based on the factors provided in CDCR regulations.  (Id. at 2.)

22        Defendant Lynch states that as reflected in the Second Level response, a review of

23   plaintiff's records reflected that all committees had double-celled plaintiff throughout his

24   incarceration at CDCR.  (Id.)  Defendant Lynch states that no mental health clinician had placed

25   plaintiff on single-cell status or recommended that plaintiff be single-celled or excluded from

26   side-by-side cells when defendant Lynch reviewed plaintiff's grievance in November 2013.  (Id.)

27   Defendant Lynch states, "Accordingly, there was nothing to indicate that any recommendation to

28   single-cell [plaintiff] for mental health reasons had been ignored by either the classification

1    committee or the First Level Reviewer." (Id.)

2         In his declaration, defendant Virga states that as indicated in the second level response, he

3    reviewed and signed it. (ECF No. 80-7 at 3.) Defendant Virga states that at the second level, he

4    determined that the first level had conducted an appropriate review and that the decision to

5    classify plaintiff as double-celled was appropriate based on the factors provided in CDCR

6    regulations. (Id.) Defendant Virga states that as reflected in the second level response, a review

7    of plaintiff's records reflected that all committees had double-celled plaintiff throughout his

8    incarceration with CDCR. (Id.) No mental health clinician had placed plaintiff on single-cell

9    status or recommended that plaintiff be single-celled or excluded from side-by-side cells when he

10   reviewed plaintiff's grievance in November 2013. (Id.) Defendant Virga states, "Accordingly,

11   there was nothing to indicate that any recommendation to single-cell [plaintiff] for mental health

12   reasons had been ignored by either the classification committee or the first level reviewer." (Id.)

13        Defendants argue that defendants Hinrichs, Virga and Lynch did not act with deliberate

14   indifference when they denied plaintiff's grievances requesting single cell status because at the

15   time they denied these grievances, plaintiff's records contained no recommendations from mental

16   health clinicians that plaintiff receive single-cell status.

17        *Plaintiff's Opposition*

18        In his opposition, plaintiff argues that defendants Virga, Lynch and Hinrichs disregarded

19   evidence that plaintiff was severely mentally ill at the time they denied his grievances. (ECF No.

20   84 at 7.) In support of this argument, plaintiff alleges that defendant Virga, as the Warden, had

21   received written notification that plaintiff was to be involuntarily medicated due to his mental

22   illness. (Id.) Plaintiff refers to an exhibit attached to his amended complaint. (Id.) It appears

23   that plaintiff is referring to an exhibit attached to his amended complaint filed September 1, 2017,

24   rather than the operative amended complaint filed September 5, 2017.

25        Attached to plaintiff's September 1, 2017 amended complaint is an order for plaintiff to be

26   involuntarily medicated, dated July 3, 2013. (ECF No. 12 at 68-77.) The order states that

27   plaintiff suffers from "bipolar mood disorder severe depression." (Id. at 68.) The report finds

28   that plaintiff is a danger to himself. (Id.) The report states,

31

> The patient was admitted to the CTC because of suicidal intent. He stated he plans to starve himself to death. He has not eaten in nine days. He refused to take mediation, saying that they make him feel worse. He lies in his bed, has refused to come to the door to even talk about this.

(Id.)

The report states that plaintiff, "is in a severe depressive state where he feels hopeless. He is immersed in perceiving only the difficulties in his life, the only answer to which is to die." (Id. at 69.) The report states that the likely harm plaintiff would suffer if not placed on psychiatric medication would be "continued suicidal ideation, continued refusal to eat because of his stated goal to starve himself to death. Organ damage can occur from such prolonged starvation." (Id. at 71.) The report also states that plaintiff was recently hospitalized twice in the Mental Health Crisis Bed Unit for suicidal ideation. (Id. at 70.) The report also states that plaintiff was not competent to consider treatment. (Id. at 73.) The report states, "He has no understanding of the nature of depression and how it affects one's judgement. He has no understanding of the role of medication in treating this depression." (Id. at 73.)

Attached to plaintiff's September 1, 2017 amended complaint is an "Interdisciplinary Progress Note-General Psychiatry," dated October 27, 2014. (Id. at 81.) This progress note describes plaintiff's mood as "dysphoric," plaintiff's affect as "labile," and plaintiff's insight and judgment as "impaired." (Id.)

Plaintiff also argues that the suicide risk evaluation by Dr. Grosse and Dr. Bowerman alerted defendants to plaintiff's mental health problems. (Id.) A report by Psychologist Bowerman, dated September 30, 2011, is attached to the amended complaint filed September 1, 2011. (ECF No. 12 at 44.) This report states that plaintiff was seen for supporting/evaluative session. (Id.) Plaintiff was currently on suicide precautions status and housed in AZZ-alternative housing. (Id.) Plaintiff stated that he was upset about being repeatedly moved to unacceptable cells or with inmates he could not reside with. (Id.) This report contains no recommendation for single cell status. (Id.)

Also attached to the September 1, 2011 amended complaint is a progress note dated October 1, 2011. (Id. at 46.) This note states that plaintiff reported that he had several cellies

over the last many months, and the layout of his cell is such that both beds are in close proximity,

causing plaintiff panic attacks and anxiety.  (Id.)  Plaintiff states that he has asked custody to

please be housed in one of the other cells where there are bunk beds or another arrangement that

will not trigger his anxiety.  (Id.)  The progress note states, "After discussing with the I/P

different approaches to trying to effect a change in cells, he agreed to go back to his housing and

talk to custody once more calmly about this request.  This clinician will also write a

recommendation to that effect in the discharge orders.  It was stressed to I/P that the decision to

change housing is solely in the discretion of custody."  (Id.)

The undersigned cannot locate in the court record any note by a clinician recommending a

change in plaintiff's housing status following issuance of October 1, 2011 progress note.

Plaintiff argues that in 2004, a mental health clinician recommended that he receive

single-cell status.  (ECF No. 84 at 14.)  Plaintiff attaches to his opposition a medical record dated

January 23, 2004 by Dr. Dias referring plaintiff for evaluation for single-cell status.  (Id. at 47.)

In the opposition, and in the operative amended complaint, plaintiff also alleges that

defendants denied his request for single-cell housing pursuant to a policy that did not require

prison officials to consider inmate mental health in making housing decisions.  (ECF No. 84 at 8,

14.)  In support of this argument, plaintiff cites a January 19, 2016 memorandum issued by

former CDCR Secretary Kernan addressed to Associate Directors, Divisions of Adult Institutions

and Wardens. (ECF No. 80-4 at 97.)  This memorandum states, in relevant part,

> This memorandum reiterates and clarifies the obligations of staff to
> consider the vulnerability of inmates with medical, mental health
> condition or developmental disabilities when determining whether to
> grant single-cell status under the California Department of
> Corrections and Rehabilitation's Department Operation Manual
> (DOM), Chapter 5, Article 46—Inmate Housing Assignments (IHA).

(Id. at 97.)

The memorandum states that an inmate with a medical, mental health condition or

developmental disabilities may be so severely disabled they cannot reasonably protect themselves

if physically threatened, or may have a condition or disability which increases their vulnerability

to attack, threats, or extortion by a cell partner.  (Id.)  The memorandum states that it is not

33

necessary that an inmate also demonstrate a history of in cell abuse in order to be approved for single-cell status.  (Id.)

The memorandum sets forth examples of inmates who should be considered for single-cell status, or other appropriate housing.  (Id. at 98.)  This includes inmates with mental health conditions that lead to bizarre or disruptive behavior, or psychotic episodes which may increase their vulnerability to attack, threats or extortion by a cell partner.  (Id.)

The memorandum states that if there is a question whether a medical or mental health condition is present, and consultation with medical or mental health staff is required, custodial staff shall submit a request for review and recommendations related to single-cell consideration. (Id.)  The memorandum states that the screening authority should consider the recommendations of medical and mental health staff regarding the most appropriate housing for the inmate given the vulnerability that may be created by their medical or mental health conditions. (Id.)

Plaintiff argues that the January 19, 2016 memorandum was issued because prison officials, like defendants, failed to consider inmate mental health when considering whether inmates qualified for single-cell status.

*Discussion*

At the outset, the undersigned clarifies that plaintiff's claims against defendants Virga, Hinrichs and Lynch are based on their denials of grievance no. SAC-13-02151.  (See Plaintiff's deposition at 18, 53-56).  Plaintiff alleges that defendants' denials of grievance no. SAC-13-02151, denying his request for single-cell status and upholding the July 3, 2013 ICC decision to double-cell plaintiff, violated his Eighth Amendment rights because defendants enforced a policy which failed to consider inmate mental health when determining cell status.

In the summary judgment motion, defendants do not directly address plaintiff's claim that they enforced a policy of failing to consider inmate mental health when determining cell status at the time they denied his grievances.  Instead, they argue that they considered plaintiff's mental health when denying his grievances requesting single-cell status.

For the reason discussed herein, the undersigned first finds that plaintiff's claim that in 2013, a policy existed that permitted prison officials to disregard inmate mental health when

34

1    making housing decisions is without merit.

2          Section 54046.8 of the California Department of Corrections and Rehabilitation

3    Department Operations Manual ("DOM") provides criteria for Single-Cell status.  This section

4    states in relevant part, that single-cell status shall be considered for those inmates who

5    demonstrate a history of in-cell abuse, significant in-cell violence towards a partner, verification

6    of predatory behavior towards a cell partner, or who have been victimized in-cell by another

7    inmate.  DOM, Article 5, § 54046.8 (2012).

8          DOM Section 54046.10 addresses recommendations for single-cells status due to mental

9    health concerns:

10               In cases where single-cell status is recommended by clinical staff due
                 to mental health or medical concerns, a classification committee shall
11               make the final determination of an inmate's cell assignment.  The
                 classification committee shall consider the clinical recommendations
12               made by the evaluating clinician with assistance from the clinician
                 who participates in the committee and review the inmate's case
13               factors when determining the housing assignment.  Single-cell status
                 based upon clinical recommendation is usually a temporary short-
14               term measure and must be periodically reviewed…

15   DOM, Article 5, § 54046.10 (2012).

16          DOM Sections 54046.8 and 54046.10 were in effect in 2013.

17          DOM § 54046.10 specifically provides that the ICC shall consider recommendations by

18   clinical staff for single-cell status due to mental health concerns.  Therefore, at the time

19   defendants denied plaintiff's grievances, the regulations permitted the ICC to consider inmate

20   mental health if clinical staff had made a recommendation for single-cell status.

21          In his opposition, plaintiff argues that former Secretary Kernan issued the January 19,

22   2016 memorandum because CDCR had a policy to disregard inmate mental health when making

23   housing assignments.  However, in the January 19, 2016 memorandum, former Secretary Kernan

24   expanded the circumstances under which custody staff could consider inmate mental health when

25   making housing decisions, beyond consideration of recommendations from mental health staff as

26   provided for in DOM § 54046.10.  Former Secretary Kernan created a new policy pursuant to

27   which custody staff were required to submit requests for review of single-cell consideration when

28   they had a question regarding whether a medical or mental health condition was present

1   warranting single-cell housing.  This policy was not in effect at the time defendants considered

2   grievance no. SAC-S-13-02151.  (See ECF No. 80-6 at 3 (defendant Hinrichs's declaration: "The

3   January 19, 2016 memorandum Coleman has referenced in this action could not have applied to

4   my review of the appeal because the appeal was submitted and decided in 2013.")

5        The January 19, 2016 memorandum suggests that the procedures contained in DOM

6   § 54046.10 did not provide for adequate consideration of inmate mental health by custody staff

7   when making housing decisions.  However, the undersigned does not find that this memorandum

8   demonstrates that prior to January 19, 2016, CDCR had a policy to disregard inmate mental

9   health when making housing decisions, as alleged by plaintiff.

10       The undersigned next considers whether defendants properly considered plaintiff's mental

11  health when they denied plaintiff's request for single-cell status and upheld the July 3, 2013 ICC

12  decision finding plaintiff eligible for double-celling.

13       The undersigned is puzzled by the July 3, 2013 ICC's failure to acknowledge plaintiff's

14  mental decompensation occurring at that time.  As discussed above, plaintiff has provided

15  evidence that on July 3, 2013, an order was issued for plaintiff to be involuntarily medicated.  The

16  order stated that plaintiff was in the CTC, i.e., Correctional Treatment Center, because of suicidal

17  ideation.  Therefore, plaintiff did not "refuse" to appear at the July 3, 2013 classification

18  committee hearing, as stated by defendant Virga in his declaration and in the Classification

19  Committee Summary.  Although the ICC report states that a treating clinician presented the ICC

20  with a Mental Health Assessment, the report suggests that the ICC was unaware of plaintiff's

21  mental state on the date of the hearing.

22       Nevertheless, for the reasons stated herein, the undersigned finds that defendants did not

23  act with deliberate indifference when they denied grievance no. SAC-13-02151.

24       As stated above, defendants state that in reviewing grievance no. SAC-13-02151, they

25  reviewed the decision of the July 3, 2013 ICC to make sure all regulations were followed.  While

26  the ICC report suggests that the committee was unaware of plaintiff's mental state on the date of

27  the hearing, DOM § 54046.10 provides that single-cell status may be granted if there is a

28  recommendation from mental health staff.  The record contains no evidence demonstrating that

36

1  mental health staff had recommended single-cell status for plaintiff at the time of the July 3, 2013

2  ICC hearing or at the times defendants reviewed plaintiff's grievances.

3      Plaintiff's evidence that a mental health clinician recommended that he receive single-cell

4  status in 2004 does not demonstrate that he required single-cell status in 2013.  While plaintiff

5  provided an October 2, 2011 progress note stating that the clinician would write a

6  recommendation for plaintiff to be housed in a cell with bunk beds or "another arrangement" that

7  would not trigger plaintiff's anxiety caused by housing in a cell with side-by-side beds, there is no

8  evidence that this recommendation was ever made.

9      Defendant Hinrichs denied plaintiff's grievance on the grounds that there was no chrono

10  in plaintiff's file for single-cell status.  Defendant Hinrichs also stated that in reviewing plaintiff's

11  grievance in September 2013, he contacted mental health staff to review plaintiff's records

12  regarding single-cell status and they reported that on plaintiff's "most recent treatment plan" "no

13  recommendation" for housing was marked and there was no mention of single-cell in recent notes

14  or treatment.  This record demonstrates that defendant Hinrichs, a custody official, upheld the

15  July 3, 2013 ICC decision finding plaintiff suitable for double-cell status, and denied plaintiff's

16  request for single-cell status, because he could not find any recommendation from clinical staff

17  for plaintiff to have single-cell status.  Based on this evidence, the undersigned finds that

18  defendant Hinrichs did not act with deliberate indifference to plaintiff's mental health needs when

19  he denied grievance no. SAC-13-02151.  Accordingly, defendant Hinrichs should be granted

20  summary judgment as to this claim.

21      As discussed above, when defendant Lynch reviewed plaintiffs' second level appeal in

22  October 2013, he found that no mental health clinician had recommended that plaintiff have

23  single-cells status for mental health reasons.  He also reviewed defendant Hinrichs's response to

24  the first level grievance, which stated that defendant Hinrichs contacted mental health staff who

25  reported that there was no recommendation for single-cell status.  Based on this information, the

26  undersigned does not find that defendant Lynch acted with deliberate indifference to plaintiff's

27  mental health needs when he prepared the proposed decision denying plaintiff's second level

28  grievance no. SAC-13-02151.

In his declaration, defendant Virga states that he denied plaintiff's second level grievance based on the proposed decision submitted to him by defendant Lynch. The undersigned finds that defendant Virga did not act with deliberate indifference when he adopted the proposed decision submitted to him by defendant Lynch because the proposed decision stated that no mental health staff recommended plaintiff for single-cell status.

Accordingly, for the reasons discussed above, the undersigned recommends that defendants Hinrichs, Lynch and Virga be granted summary judgment as to plaintiff's Eighth Amendment claim.

G. Qualified Immunity

Defendants Hinrichs, Lynch and Virga also move for summary judgment on the grounds that they are entitled to qualified immunity.

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists. First, the court asks: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id. To be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 202 (internal quotation marks and citation omitted). Accordingly, for the purposes of the second prong, the dispositive inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. Courts have the discretion to decide which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

As for the first prong of the qualified immunity analysis, for the reasons discussed above, the undersigned finds that defendants Hinrichs, Lynch and Virga did not violate plaintiff's Eighth Amendment rights when they denied plaintiff's grievance.

For the following reasons, the undersigned also finds that defendants are entitled to qualified immunity as to the second prong of the qualified immunity analysis. As stated above, at

38

the time defendants denied plaintiff's grievance, DOM § 54046.10 provided that single-cell status may be granted if there is a recommendation from mental health staff. Defendants denied plaintiff's grievances on the grounds that no mental health staff had recommended single-cell status for plaintiff. Thus, it is clear that defendants relied on this regulation when denying plaintiff's grievance.

Plaintiff may be arguing that defendants should have asked mental health staff to evaluate his request for single-cell status, or asked the ICC to submit such a request, as suggested by the 2016 memorandum. However, at the time defendants reviewed plaintiff's grievance in 2013, DOM § 54046.10 provided for single-cell status if there was a recommendation by mental health staff. In other words, DOM § 54046.10 did not require custody staff to request mental health staff to evaluate an inmate for single-cell status.

The undersigned finds that defendants reasonably relied on DOM § 54046.10 when they denied plaintiff's request for single-cell status in 2013 and upheld the July 3, 2013 ICC decision finding plaintiff eligible for double-cells status. In other words, it would not have been clear to reasonable correctional staff in 2013 that reliance on the procedures set forth in § 54046.10 for evaluating requests for single-cell status was unlawful. On these grounds, defendants Hinrichs, Lynch and Virga are entitled to qualified immunity.

H. Plaintiff's Eighth Amendment Claim Against Defendant Haring

Defendants move for summary judgment on the grounds that defendant Haring did not violate plaintiff's Eighth Amendment rights when he refused to move plaintiff from the cell with side-by-side beds in September 2011. As discussed, the undersigned recommends that defendant Haring be granted summary judgment as to this claim on the grounds that it is barred by the statute of limitations and on the grounds that plaintiff released this claim in the settlement agreement reached in Coleman v. CDCR, 2: 13-cv-1021 JAM KJN P (E.D.). For these reasons, the undersigned need not consider whether defendant Haring violated plaintiff's Eighth Amendment rights.

////

////

Accordingly, IT IS HEREBY ORDERED that:

1.  Defendants' motion to strike plaintiff's sur-reply (ECF No. 90) is granted, except for plaintiff's declaration attached to the sur-reply;

2.  Plaintiff's motion for sanctions, motion for appointment of counsel and motion for appointment of an expert witness (ECF No. 92) are denied;

3.  Plaintiff's supplemental motion for sanctions (ECF No. 93) is denied;

4.  Plaintiff's motion to amend the evidence (ECF No. 94) is denied; and

IT IS HEREBY RECOMMENDED that:

1.   Plaintiff's cross-motion for summary judgment (ECF No. 84) be stricken as untimely;

2.  Defendants' summary judgment motion (ECF No. 80) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  January 8, 2021

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Cole851.57

40